## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| INDEMNITY INSURANCE COMPANY | ) | FILED: AUGUST 6, 2008 |
| OF NORTH AMERICA, as subrogee of | ) | 08CV4451 |
| W.W. GRAINGER, INC. | ) | JUDGE COAR |
| | ) | |
| v. | ) No. | MAGISTRATE JUDGE DENLOW |
| | ) | |
| STEINER INDUSTRIES, INC. and ORIENT | ) | JFB |
| OVERSEAS CONTAINER LINE d/b/a OOCL, | ) | |
| a wholly-owned subsidiary of ORIENT | ) | |
| OVERSEAS (INTERNATIONAL) | ) | |
| LIMITED (OOIL) | ) | |

### COMPLAINT

NOW COMES Plaintiff, Indemnity Insurance Company of North America as subrogee of W.W. Grainger, Inc., by and through its attorneys, Leahy, Eisenberg & Fraenkel, Ltd., and complaining against Defendants, Steiner Industries, Inc. and Orient Overseas Container Line d/b/a OOCL, a wholly-owned subsidiary of Orient Overseas (International) Limited (OOIL), alleges and states as follows:

### Jurisdiction and Venue

1.     Jurisdiction in this matter is proper pursuant to the Carriage of Goods by Sea Act, 46 U.S.C. 1302, and 28 U.S.C. 1333 as this is an admiralty and maritime case within the meaning of the Federal Rules of Civil Procedure, or alternatively 28 U.S.C. 1331 as a federal question.  Jurisdiction is further proper pursuant to 28 U.S.C. 1332 and 28 U.S.C. 1367 as all of the claims in this Complaint are part of the same case and controversy.

2.     Venue in this matter is proper pursuant to 28 U.S.C. 1391.

-

1

## Parties

3.     Plaintiff, Indemnity Insurance Company of North America ("Indemnity") is the *bona fide* owner of the claims and causes of action set forth below, having obtained the same by reason of its payment to and/or on behalf of its insured, W.W. Grainger, Inc. ("Grainger") under a policy of insurance.

4.     Indemnity is a Pennsylvania corporation with its principal place of business in Pennsylvania.

5.     Defendant Steiner Industries, Inc. ("Steiner") is in the business of manufacturing, supplying and selling protective clothing and related goods and is incorporated in the State of Illinois with its principal place of business in Chicago, Illinois.

6.     Defendant Orient Overseas Container Line d/b/a OOCL, a wholly-owned subsidiary of Orient Overseas (International) Limited (OOIL), ("OOCL") is a foreign corporation in the business of transporting commercial freight through international and interstate commerce as a common carrier and conducts business in the state of Illinois.

## Count I – COGSA against OOCL

1-6.     Plaintiff adopts and realleges paragraphs 1-6 as paragraphs 1-6 of Count I as if fully set forth herein.

7.     On or about July 8, 2007, OOCL agreed to transport 1756 cartons of clothes, including vests, chore coats, bib overalls, and coveralls, manufactured by Steiner, from Ho Chi Minh City to Grainger in Kansas City, Missouri, in part via ocean carriage.  (See attached hereto and marked as Exhibit A is a copy of the through Bill of Lading issued by OOCL).

8.     On or about July 8, 2007, OOCL received the goods in good order and condition.

2

9.     At all times relevant, OOCL owed Plaintiff's subrogor, Grainger, a duty to properly arrange, ship, transport and deliver the shipment in the same good order and condition in which the shipment was received pursuant to the terms and conditions of the bill of lading and pursuant to its obligations as a common carrier of goods for hire under the Carriage of Goods by Sea Act, 46 U.S.C. 1301, *et seq.* ("COGSA").

10.     Notwithstanding said duties and in breach thereof, OOCL did not properly arrange, ship, transport and deliver the shipment in the same good order and condition as received as required by the bill of lading and COGSA.

11.     On or about August 6, 2007, Grainger received the shipment and discovered that the cargo was not in good order and condition because insects, bugs, ticks, or similar creatures had entered the packaging and infested the cargo.

12.     As a direct and proximate result of OOCL's breach of its duties, Plaintiff and Plaintiff's subrogor were damaged in an amount equal to $87,050.28.

WHEREFORE, Plaintiff, Indemnity Insurance Company of North America, as subrogee of W.W. Grainger, Inc., respectively requests judgment in its favor and against Defendant Orient Overseas Container Line d/b/a OOCL, a wholly-owned subsidiary of Orient Overseas (International) Limited (OOIL), in the amount of $87,050.28, plus costs, prejudgment interest, and all other relied deemed appropriate by this Honorable Court.

## Count II – Bailment against OOCL

1-6.     Plaintiff adopts and realleges paragraphs 1-6 as paragraphs 1-6 of Count II as if fully set forth herein.

7.     On or about July 8, 2007, OOCL agreed to transport 1756 cartons of clothes, including vests, chore coats, bib overalls, and coveralls, manufactured by Steiner, from Ho

Chi Minh City to Grainger in Kansas City, Missouri. (See attached hereto and marked as Exhibit A is a copy of the through Bill of Lading issued by OOCL).

8.    On or about July 8, 2007, OOCL received the cargo in good order and undamaged condition.

9.    At the time that OOCL received the cargo, on or about July 8, 2007, OOCL assumed the care, custody and control of the cargo.

10.    Based upon OOCL's assumption of care, custody and control of the cargo, OOCL was a bailee with respect to the cargo.

11.    As a bailee of the cargo, OOCL was required by and through its authorized agents and employees to exercise due care for the protection and safekeeping of the cargo until delivery to its destination.

12.    OOCL breached its duties and obligations as a bailee by failing to adequately and properly protect and safeguard the subject cargo so as to prevent damage to the cargo and Plaintiff and Plaintiff's subrogor.

13.    While in the possession, care, custody and control of OOCL, Plaintiff's subrogor's property became damaged through infestation of insects, bugs, ticks, or similar creatures.

14.    As a direct result of OOCL's breach of its duties as a bailee, Plaintiff and Plaintiff's subrogor did not receive the subject cargo in a good order and undamaged condition, and they were damaged in an amount equal to $87,050.28.

WHEREFORE, Plaintiff, Indemnity Insurance Company of North America, as subrogee of W.W. Grainger, Inc., respectively requests judgment in its favor and against Defendant Orient Overseas Container Line d/b/a OOCL, a wholly-owned subsidiary of Orient

Overseas (International) Limited (OOIL), in the amount of $87,050.28, plus costs, prejudgment interest, and all other relied deemed appropriate by this Honorable Court.

## Count III – Negligence against OOCL

1-6.    Plaintiff adopts and realleges paragraphs 1-6 as paragraphs 1-6 of Count III as if fully set forth herein.

7.    On or about July 8, 2007, OOCL agreed to transport 1756 cartons of clothes, including vests, chore coats, bib overalls, and coveralls, manufactured by Steiner, from Ho Chi Minh City to Grainger in Kansas City, Missouri.  (See attached hereto and marked as Exhibit A is a copy of the through Bill of Lading issued by OOCL).

8.    On or about July 8, 2007, OOCL received the cargo in good order and undamaged condition.

9.    At the time that OOCL received the cargo, on or about July 8, 2007, OOCL assumed the care, custody and control of the cargo.

10.    Based upon OOCL's assumption of care, custody and control of the cargo, OOCL owed a duty to Plaintiff and Plaintiff's subrogor to deliver the cargo in the same good order and condition as received.

11.    As a company in the business of transporting goods and cargo through international and interstate transportation, OOCL was required by and through its authorized agents and employees to exercise due care for the protection and safekeeping of the cargo until delivery to its destination.

12.    OOCL breached its duties by failing to adequately and properly protect and safeguard the subject cargo so as to prevent damage to the cargo and Plaintiff and Plaintiff's subrogor.

13.    While in the possession, care, custody and control of OOCL, Plaintiff's subrogor's property became damaged through infestation of insects, bugs, ticks, or similar creatures, thereby breaching OOCL's duties owed to Grainger.

14.    As a direct result of OOCL's breach of its duties imposed upon it as a business that transport goods, Plaintiff and Plaintiff's subrogor did not receive the subject cargo in a good order and undamaged condition, and they were damaged in an amount equal to $87,050.28.

WHEREFORE, Plaintiff, Indemnity Insurance Company of North America, as subrogee of W.W. Grainger, Inc., respectively requests judgment in its favor and against Defendant Orient Overseas Container Line d/b/a OOCL, a wholly-owned subsidiary of Orient Overseas (International) Limited (OOIL), in the amount of $87,050.28, plus costs, prejudgment interest, and all other relied deemed appropriate by this Honorable Court.

## Count IV – Breach of Contract against Steiner

1-6.    Plaintiff adopts and realleges paragraphs 1-6 as paragraphs 1-6 of Count IV as if fully set forth herein.

7.    On or about September 4, 2003, Steiner and Grainger entered into a written contract for Steiner to manufacture products for Grainger and Grainger would pay Steiner for the production of such products.  ("The Contract").  (See the Contract between Steiner and Grainger attached as Exhibit B).

8.    The products to be produced pursuant to the contract included protective clothing, such as vests, chore coats, bib overalls, and coveralls.

9.    Pursuant to the terms of the contract, the products manufactured by Steiner, personally or through it agents, successors, assigns, sub-contractors, or employees, were to be

delivered to Grainger under the following conditions and warranties, which identify Steiner's

duties and obligations owed to Grainger under the contract:

### 9.  SUPPLIER WARRANTY

Your warranty, as reviewed and approved by GGS, will be passed through to our customers on the date Products are purchased by the ultimate end user.  Supplier warrants and guarantees that for three (3) years from the date of receipt of Product by GGS at a U.S. port of entry, that the Products shall be free from manufacturing defects, will be manufactured in accordance with agreed specifications and samples; and will be merchantable and fit for the purposes for which the Products are intended to be used.

a) You will be provided 100% reimbursement for all products returned for product failures, recalls and corrective actions.

b) Reimbursement for in-warranty product failures will be as agreed to by GGS and Supplier...

10.     In the contract, entitled "Grainger Global Sourcing Purchase Order Terms and

Conditions," the following product warrantee was included, which further identifies Steiner's

duties and obligations owed to Grainger under the contract:

### 2.  PRODUCT WARRANTY

Supplier warrants and guarantees that for three (3) years from the date of receipt of Products by GGS at a U.S. port of entry, that the Products shall be free from manufacturing defects, will be manufactured in accordance with agreed specifications and samples; and will be merchantable and fit for the purposes for the Products are intended to be used; and that the patents, trademarks, trade names, designs and trade dress and proprietary rights used in the manufacture of Product or the Products are either owned by or used under authorized license or other means by Supplier.  Products are warranted to be in compliance with all applicable State and U.S. government agency requirements and other standards. Supplier shall provide reasonable cooperation regarding resolution of defective product manufacturing claims and issues, including but not limited to:   resale credits or

> reimbursement for rework costs (including disposal and shipment costs) for defective and damaged product, which in the reasonable discretion of GGS cannot be reworked.

11.    Attachment 2 of the contract, the Purchase Order Terms and Conditions, provides as follows, which further identify Steiner's duties and obligations owed to Grainger under the contract:

### 3. QUALITY CONTROL

> On all Product shipments, Supplier shall inspect for quantity and quality. However, GGS, or its agent, shall have the right to make its own inspection and reject any Products not complying with any Purchase Order or this Agreement...

12.    Prior to July 8, 2007, Grainger placed an order with Steiner for Steiner, through its agents, successors, assigns, sub-contractors, or employees, to manufacture protective clothing for Grainger, including vests, chore coats, bib overalls, and/or coveralls, pursuant to the contract.

13.    Steiner, through it agents, successors, assigns, sub-contractors, or employees, manufactured the protective clothing ordered by Grainger, which was then transported to Grainger.

14.    On or about August 6, 2007, Grainger discovered that the cargo received from Steiner, through its common carriers, agents, successors, assigns, sub-contractors, or employees, was not in good order and condition because insects, bugs, ticks, or similar creatures had entered the packaging and infested the cargo.

15.    Given the presence of insects on the clothing, Steiner failed to deliver the goods to Grainger in a good and merchantable condition, nor was the cargo fit for its intended purpose.

16.    As such, Steiner breached the contract, including but not limited to the provisions cited above, because Steiner failed to deliver the cargo in the condition guaranteed by the warranties in the contract.

17.    As a direct result of Steiner's breach of its duties imposed upon it by the contract, Plaintiff and Plaintiff's subrogor were damaged in an amount equal to $87,050.28.

WHEREFORE, Plaintiff, Indemnity Insurance Company of North America, as subrogee of W.W. Grainger, Inc., respectively requests judgment in its favor and against Defendant Steiner Industries, Inc. in the amount of $87,050.28, plus costs, prejudgment interest, and all other relied deemed appropriate by this Honorable Court.

### Count V – Negligence against OOCL

1-6.    Plaintiff adopts and realleges paragraphs 1-6 as paragraphs 1-6 of Count V as if fully set forth herein.

7.    On or about July 8, 2007, Steiner agreed to deliver 1756 cartons of clothes, including vests, chore coats, bib overalls, and coveralls, that it had manufactured pursuant to an order received from Grainger, from Ho Chi Minh City to Grainger in Kansas City, Missouri.  (See attached hereto and marked as Exhibit C is a copy of a Forwarder's Cargo Receipt).

8.    Prior to July 8, 2007, Steiner manufactured the clothes ordered by Grainger and at all times relevant the clothes stayed in the care, custody or control of Steiner, or its common carriers, agents, successors, assigns, sub-contractors, or employees.

9.    As a company that manufactures, sells and delivers clothes internationally and interstate, Steiner was under a duty to protect, safeguard, and deliver the cargo to Grainger in good order and undamaged condition, and fit for the purpose of the product.

9

10.    On or about August 6, 2007, Grainger discovered that the cargo received from Steiner, through its common carriers, agents, successors, assigns, sub-contractors, or employees, was not in good order and condition because insects, bugs, ticks, or similar creatures had entered the packaging and infested the cargo.

11.    Steiner breached its duties by failing to adequately and properly protect and safeguard the subject cargo so as to prevent damage to the cargo and Plaintiff and Plaintiff's subrogor.

12.    As a direct result of Steiner's breach of its duties, Plaintiff and Plaintiff's subrogor did not receive the subject cargo in a good order and undamaged condition, and they were damaged in an amount equal to $87,050.28.

WHEREFORE, Plaintiff, Indemnity Insurance Company of North America, as subrogee of W.W. Grainger, Inc., respectively requests judgment in its favor and against Defendant Steiner Industries, Inc. in the amount of $87,050.28, plus costs, prejudgment interest, and all other relied deemed appropriate by this Honorable Court.

Respectfully submitted,

INDEMNITY INSURANCE COMPANY OF
NORTH AMERICA

By:    /s/ Todd J. Pinsky
       One of its attorneys

Todd J. Pinsky, ARDC # 6278249
Robert Ostojic, ARDC # 6216651
LEAHY, EISENBERG & FRAENKEL, LTD.
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
(312) 368-4554

F:\Case\014702\12956\COMPLAINT.doc

08/27/2007 MON 13:26  FAX 847 535 9233 Grainger                                   ☑001/010

## OOCL ORIENT OV. ..AS CONTAINER LINE®

|  | ORIGINAL | | BILL OF LADING (Non Negotiable Unless Consigned "to Order") |
|---|---|---|---|

| SHIPPER/EXPORTER (COMPLETE NAME AND ADDRESS) | BOOKING NO. 3022015000 | BILL OF LADING NO. OOLU3022015000 |
|---|---|---|
| CENTURY DISTRIBUTION SYSTEMS, INC ON BEHALF OF APEX VIETNAM CO., LTD NO.3 STREET, DONG AN INDUSTRIAL PARK, THUAN AN DISTRICT, BINH DUONG PROVINCE | EXPORT REFERENCES SC# PE073609 | 741555 |

| CONSIGNEE (COMPLETE NAME AND ADDRESS) | FORWARDING AGENT-REFERENCES FMC NO. |
|---|---|
| GRAINGER GLOBAL SOURCING 11200 EAST 210 HIGHWAY KANSAS CITY, MO 64161 TEL: 847-535-1402 ATTN: JESSICA QUINN | |
| | POINT AND COUNTRY OF ORIGIN OF GOODS |

| NOTIFY PARTY (COMPLETE NAME AND ADDRESS) | ALSO NOTIFY PARTY-ROUTING & INSTRUCTIONS |
|---|---|
| E.BESLER & CO 115 MARTIN LANE ELK GROVE VILLAGE, IL 60007 ATTN: MIKE KOSECK/GRACE KUCZYNSKA   TEL: 847-781-6464 | GRAINGER GLOBAL SOURCING 100 GRAINGER PARKWAY LAKE FOREST, IL 60045 TEL: 847 233 8636 ATTN: JESSICA QUINN |

| PRECARRIED BY | PLACE OF RECEIPT |
|---|---|
| NYK Lodestac v.44 | HO CHI MINH CITY |
| VESSEL/VOYAGE/FLAG UNI-PACIFIC V.077B | PORT OF LOADING HO CHI MINH CITY | LOADING PIER / TERMINAL | ORIGINALS TO BE RELEASED AT HO CHI MINH CITY |
| PORT OF DISCHARGE LOS ANGELES, USA  7-28 | PLACE OF DELIVERY KANSAS CITY, MO, USA | TYPE OF MOVEMENT (IF MIXED, USE DESCRIPTION OF PACKAGES AND GOODS FIELD) FCL / FCL |

| ( CHECK "YES" COLUMN IF HAZARDOUS MATERIAL ) PARTICULARS DECLARED BY SHIPPER BUT NOT ACKNOWLEDGED BY THE CARRIER | | | |
|---|---|---|---|
| CNTR. NOS. W/SEAL NOS. MARKS & NUMBERS | QUANTITY FOR CUSTOMS DECLARATION ONLY | DESCRIPTION OF GOODS | GROSS WEIGHT | MEASUREMENT |
| TGHU9143139  / AAT8260 TRLU4950708  / AAT8259 OOLU7702710  / AAT8895 | | 627 CARTONS  /FCL / FCL 624 CARTONS  /FCL / FCL 505 CARTONS  /FCL / FCL | /40HQ/ /40HQ/ /40GP/ | |
| SHIPPING MARKS: -FRONT & BACK- GGS KANSAS CITY, MO RN# GGS P.O#: STOCK NO.: MFR ITEM NO.: SIZE: Q'TY: G.W: LBS N.W: LBS C/NO: MADE IN VIETNAM | 1756 CARTONS | VEST, CHORE COAT, BIB OVERALLS, COVERALLS PURCHASE ORDER NUMBER 016648 L/C NO.: CICI-323858 THIS SHIPMENT DOES NOT CONTAIN ANY WOOD PACKING MATERIAL STORE DOOR DELIVERY | 21317.000KGS | 180.100CBM |
| | | ** TO BE CONTINUED ON ATTACHED LIST ** | | |

NOTICE 1: For carriage to or from the United States of America, if Clauses 4 and 22 on the reverse hereof limit the Carrier's liability to a maximum of U.S. \$500 per package (or customary freight unit) or other of shipments of the U.S. Carriage of Goods by Sea Act ("COGSA"), the Standard provisions a higher single limit of value and may be declared in value or value declared in writing by the shipper before shipment and inserted on the reverse of this B/L ("ad valorem").

NOTICE 2: See Clause 16 on the reverse side contain terms by a higher ad valorem rate will be charged.

NOTICE 3: If Carrier issued an insert at shipper's sole discretion shall consent thereto by Carrier, terms therein would be. ..) Merchant enters a value, Carrier's limitation of liability shall not apply and the ad valorem rate will be charged.

Declared Cargo Value US\$ _____

| FREIGHT & CHARGES PAYABLE AT / BY: | SERVICE CONTRACT NO. PE073609 | DOC FORM NO. | COMMODITY CODE |
|---|---|---|---|
| CODE | TARIFF ITEM | FREIGHTED AS | RATE | PREPAID | COLLECT | |
| | | | | | | |

| | |
|---|---|
| | DATE CARGO RECEIVED 8 JUL 2007 |
| | DATE LADEN ON BOARD #/ 10 JUL 2007 |
| | DATED 10 JUL 2007 |

The printed terms and conditions appearing on the face and reverse side of this Bill of Lading are hereby incorporated in OOCL's published B/L terms, and in particular:
• TERMS SET OUT ON REVERSE SIDE
• SEE CLAUSE 1 ON REVERSE SIDE
• SEE CLAUSE 3 ON REVERSE SIDE

$11,6916

OOCL (VIETNAM) CO., LTD          ORIENT OVERSEAS CONTAINER LINE AS CARRIER

OOCL (VIETNAM) CO., LTD

AS AGENT FOR OOCL THE CARRIER

[EXHIBIT A stamp]

FILED: AUGUST 6, 2008
08CV4451
JUDGE COAR
MAGISTRATE JUDGE DENLOW

JFB

**OOCL** ORIENT OVE  AS CONTAINER LINE®                                          PAGE: 2 OF 2

ORIGINAL

| VESSEL: UNI-PACIFIC | | | VOYAGE: V.077B | B/L NO.: OOLU3022015000 | |
|---|---|---|---|---|---|
| CNTR MOVL N/SEAL NOS MARKS & NUMBERS | QUANTITY (FOR CUSTOMS DECLARATION ONLY) | | DESCRIPTION OF GOODS | GROSS WEIGHT | MEASUREMENT |

OCEAN FREIGHT COLLECT

TOTAL NO. OF CONTAINERS/PACKAGES RECEIVED & ACKNOWLEDGED
BY CARRIER FOR THE PURPOSE OF CALCULATION OF PACKAGE
LIMITATION (IF APPLICABLE):    3 CONTAINER(S)/PACKAGE(S)

DESTINATION CHARGES COLLECT PER LINE TARIFF,
AND TO BE COLLECTED FROM THE PARTY
WHO LAWFULLY DEMANDS DELIVERY OF THE CARGO
AT SHIPPER'S LOAD, COUNT, STOWAGE & SEAL
INTENDED MOTHER VESSEL: NYK LODESTAR V.044E (44E28)

SIGNED OOCL (VIETNAM) CO., LTD
BY:

OOCL (VIETNAM) CO., LTD

AS AGENT FOR OOCL-THE CARRIER

FILED: AUGUST 6, 2008
08CV4451
JUDGE COAR
MAGISTRATE JUDGE DENLOW

JFB

September 04, 2003

Mr. Robert Steiner
Steiner Industries
5801 N. Tripp Ave.
Chicago, IL 60646

Dear Bob,

    We are pleased to inform Steiner Industries that Grainger International, Inc. by its Grainger Global Sourcing (GGS) division, having its principal place of business at 100 Grainger Parkway, Lake Forest, IL 60045-5201 ("GGS"), has accepted your company as an approved vendor. This "Agreement" sets forth our mutual understanding of the terms and conditions that will govern our relationship, which we ask that you acknowledge by your signature. Please review our requirements carefully, and if you have any questions, please contact {enter Procurement Manager) immediately.

1.  **TERM**
    The Initial Term of this Agreement is one (1) year beginning September 1, 2003 and ending August 31, 2004. This Agreement's term will automatically renew for successive one (1) year Renewal Terms unless either party hereto provides written notice of termination to the other party at least ninety (90) days prior to expiration of the Initial Term or any Renewal Terms hereof in accordance with paragraphs 17 of this Agreement.

2.  **CONDITIONS OF SALE**
    All GGS purchases will be subject to and governed by this Agreement, GGS's Supplier Information Handbook, GGS's Confidentiality Agreement (attachment 1) and GGS's Purchase Order Terms and Conditions (attachment 2) that are incorporated into this Agreement. This Agreement includes and applies to all Products (finished goods and parts) purchased by GGS from Supplier including items currently bought from Supplier and previously purchased from Supplier. In addition, you grant GGS non-exclusive worldwide rights for the advertising, sale, and export from the United States and other countries of your Product and parts.

3.  **PRODUCT COST**
    Product costs are based on your quotation-dated August 29, 2003 to GGS (attachment 3). Product costs are firm indefinitely, requested cost adjustments will be communicated to GGS, for its consideration, by written notice 90 days in advance. Material costs will be tracked by Supplier and reported periodically to GGS. Material cost reductions will be analyzed at least quarterly by the Supplier and Product cost reductions presented to GGS.

4.  **SUPPLIER INVOICING AND PAYMENT TERMS**
    Invoices shall be paid after GGS receipt of specified original documents (see Supplier Handbook). Invoice payment terms for ocean shipments are TT (wire transfer) 10 days against receipt of original documents. Domestic shipment terms will be Net 30 days. Product cost effective date is based on GGS purchase order date, not date of shipment of products.

5.  **SUPPLIER MANUFACTURING LEAD TIME**
    Lead time is 90 days from issuance of Purchase Order.

6.  **FREIGHT TERMS -** GGS shall take title to the product at the port of export unless otherwise agreed. All Products sold to GGS hereunder shall be sold F.O.B. at a port specified by GGS in its purchase order (Incoterms 2000), or at such other point of delivery, including such airports as GGS may from time to time specify.



7. **REBATE (Not Applicable)**
Terms: [Type in terms]
Frequency: [Type in terms (e.g. to be paid monthly / quarterly / annually)]
Form of Collection: [Type in terms (e.g. credit memo / check / debit)]
Rebate Period: [Type in terms (e.g. January through December)]
Comments: [Type in any additional terms not listed above]

8. **MARKETING FUNDING (Not Applicable)**
Marketing Funding to support GGS's marketing programs will be requested if you decide to participate in a special marketing program that will assist in accelerating sales of your products to our customers.

9. **SUPPLIER WARRANTY**
Your warranty, as reviewed and approved by GGS, will be passed through to our customers on the date Products are purchased by the ultimate end user. Supplier warrants and guarantees that for three (3) years from the date of receipt of Product by GGS at a U.S. port of entry, that the Products shall be free from manufacturing defects, will be manufactured in accordance with agreed specifications and samples; and will be merchantable and fit for the purposes for which the Products are intended to be used.
   a) You will provide 100% reimbursement for all products returned for product failures, recalls and corrective actions.
   b) Reimbursement for in-warranty product failures will be as agreed to by GGS and Supplier.
   c) You will immediately notify GGS in writing and by e-mail of any potential or actual stop sale, product recall or corrective action on a product distributed by GGS, and consult with GGS prior to undertaking any action. You will, upon request, and subject to the attached Purchase Order terms and conditions, immediately reimburse GGS for all business interruption costs, exclusive of lost profits and/or lost business opportunities, associated with the stop sale, product recall, and reasonable internal customer related costs associated with identification and notification of customers, and the processing of a recall through our system (including labor and materials for the repair and replacement of products, freight and handling charges, customer service, administration, etc.).

10. **PRODUCT LIABILITY INSURANCE AND PRODUCT LIABILITY INDEMNITY**
   a. Insurance. Supplier will provide Product Liability Insurance to cover all Products sold to Grainger Global Sourcing (GGS). GGS considers evidence of Product Liability Insurance to be a copy of an Accord Certificate of Insurance and a copy of the Broad Form Vendors Endorsement (Form CG 20 15 11 88) issued by your insurance company or broker. GGS requires that Supplier provide proof of insurance before or upon execution of this Agreement and annually thereafter as your Product Liability Insurance renews. Please refer to the Supplier Handbook - Product Liability Insurance, for additional information.

   b. Indemnity. Seller agrees to protect, defend, indemnify, assume any liability, save and hold harmless GGS, Grainger International Inc., W. W. Grainger, Inc and its agents, subsidiaries and affiliates, employees, insurers, successors and assigns, from and against any claims, demands, suits, liabilities, penalties, losses, damages, or charges, settlements, judgments, costs and expenses (including attorney's fees incurred), which at any time be imposed upon, incurred by or asserted or awarded against GGS ("Liabilities") relating to any Product covered by this purchase order or Agreement, including but not limited to Liabilities arising out of or allegedly based on any defect, failure, failure to warn, failure to label or disclose, breach of warranty or representation (express or implied), any Product safety or quality control recall, corrective action, Product retrofit, and any legal proceeding connected with any such Product or arising out of any actual or alleged violation, with respect to such Products of any international, Federal, state, or local treaty, law, statute, ordinance, administrative order, rule, or regulation, regulatory proposition, enactment or resolution. This indemnity includes, but is not limited to, any claim arising under Paragraphs 10b and 14-17 herein.

11. **LIMITATION OF LIABILITY**
Except as otherwise provided in this Agreement, GGS shall not be liable for any direct, indirect, consequential, exemplary, or punitive damages, including lost profits, arising out of this Agreement, whether in tort, contract, strict liability, or under any other legal theory at law or in equity.

12. **PRODUCT INFORMATION AND DATA APPROVAL**
Supplier shall provide to GGS complete and accurate, and annually updated information and data for all Supplier products, whether or not purchased by GGS. Supplier shall provide and maintain competitor cross-reference data for Products, as agreed by Supplier and GGS. Supplier shall annually review and certify the accuracy of all product information and data provided to GGS.

## 13. PRODUCT INFORMATION AND DATA RIGHTS

Supplier grants to GGS a non-exclusive, perpetual, irrevocable, worldwide, royalty-free right to use all product information and data provided by Supplier, including but not limited to manuals, applications, safety information and cross reference data, in connection with GGS's business. This right includes, but is not limited to the right to copy, publish, sell, transfer, distribute, sublicense and prepare derivative works (including translations) of such information by any method, and in any and all forms and media now or hereafter known. Such right may be exercised by GGS, Grainger International Inc., W.W. Grainger, Inc and their divisions, subsidiaries and affiliates, and commences on the date of the Initial Term of this Agreement.

## 14. CUSTOMS REQUIREMENTS AND ORIGIN CRITERIA

GGS shall be responsible for applicable U.S. customs duties unless otherwise agreed to. As instructed, Supplier shall mark all Products and/or packaging with their country of manufacture (origin) as instructed and provide Harmonized Tariff codes and Export Commodity Control Numbers (ECCN's). Supplier shall be responsible for obtaining any import or export licenses, visas, and quotas and paying fees therefor. Supplier's invoices shall contain all information necessary to clear U.S. Customs (see Supplier Information Handbook.) In the event of commencement of any antidumping investigation, Supplier agrees to reasonably cooperate with the U.S. government and GGS, including promptly providing any required information on the sale of the Supplier's products (prices, quantities, terms of sale, etc.) in its home market. You will promptly notify GGS of any changes in the status of the origin designation supplied. If the products are eligible for preferential duty program, such as Generalized System of Preferences (GSP), Supplier shall furnish all documentation to establish eligibility of the products.

## 15.1 INTELLECTUAL PROPERTY

a. Supplier Marks: Grainger Global Sourcing (GGS) has a non-exclusive, perpetual, irrevocable, worldwide, royalty-free right to use Supplier trademarks, logos, service marks, tradenames, copyrighted material, and domain names in connection with any promotional, sales or marketing materials, documentation or information including but not limited to catalogs and web sites and other electronic and paper media. This right includes, but is not limited to, the right to use, copy, publish, transfer, distribute, and prepare derivative works (including translations) containing such Marks by any method, and in any and all forms and media now or hereafter known, and to use the Marks with any promotional, sales or marketing materials, documentation or information. Such rights may be exercised by Grainger, its divisions, subsidiaries and affiliates, and commence on the effective date of this Agreement.

b. GGS Marks: If Supplier is providing private label products, it will be required to execute a trademark license.

c. Stock numbers and Stock Keeping Unit numbers (collectively "SKUs") used by GGS ("GGS SKUs") are GGS proprietary information, and may be reassigned and reuse the Grainger SKU's in its sale description.

## 15.2 INFRINGEMENT WARRANTY AND INDEMNITY

a. Supplier has reviewed the Products to be purchased by Grainger Global Sourcing (GGS), and represents and warrants that Products sold to GGS will not infringe or violate, any third party rights, including without limitation, any property, contractual, copyright, trademark, trade dress, patent, proprietary information or non-disclosure rights.

b. Supplier shall defend, hold harmless and indemnify W.W. Grainger, Inc., GGS, Grainger International, Inc., and its customers and agents for any claim, allegation, judgement, loss, damage, expense or liability, (including attorneys fees, costs and expenses), that may result by reason of any allegation or lawsuit of patent, trademark, copyright, trade dress or other proprietary right, infringement or claim. Grainger Global Sourcing shall promptly notify Supplier of any claim, and Supplier shall promptly assume the defense and indemnification of the tendered claim.

## 16. HAZARDOUS PRODUCT LABELING

Supplier shall label all hazardous materials as defined by applicable United States federal, state and local statutes, laws, propositions, and regulations, ("Laws") as required by such laws. Supplier agrees to comply with all Laws relating to the environment including those relating to the packaging, labeling, and distribution of products that contain hazardous materials, including but not limited to California Proposition 65 and the Hazardous Communication Standards promulgated by the United States Occupational Safety and Health Administration. Supplier agrees to provide timely, complete, accurate and up-to-date information as required by applicable Laws.

## 17.1 PRODUCT TERMINATION AND DISCONTINUANCE OBLIGATIONS

Either party shall have the right to immediately terminate this Agreement if (a) the other party breaches this Agreement and does not completely remedy the breach within thirty (30) days after receiving notification from the other party; (b) the other party becomes insolvent or bankrupt, files for reorganization or a receiver or trustee is appointed; or (c) the other party merges, is acquired or effects a substantial change in asset, ownership or management. In any event, either party shall have the right to terminate this Agreement without cause upon ninety (90) days written notice. Upon termination for any cause by either party, Supplier shall deliver all completed Products

to GGS that were ordered by an accepted purchase order. GGS shall have the right, with appropriate documentation, to set-off any payments due Supplier against claims against the Supplier by a third party.

**17.2 CONTINUING OBLIGATIONS UNDER TERMINATION**

The following are your continuing obligations when either you or GGS discontinues and or terminates selling some or all products purchased by GGS under this agreement (as applicable):

a) Rebates / Marketing Funds will be paid to GGS through the final shipment of discontinued product(s).

b) You must notify GGS immediately regarding any potential or actual stop sales, Product recall or corrective action on a Product distributed by GGS for a period of five (5) years from date of last shipment. Refer to Supplier Warranty section of this Agreement for additional information regarding Stop Sales and Recalls.

c) You will immediately notify GGS of any regulatory issues, rulings and changes affecting discontinued product(s) for five (5) years after your last shipment to GGS;

d) You will continue to support GGS replacement parts requirements for all Products being discontinued for a period of three (3) years for national branded items and five (5) years for private label items; and

e) You shall permit GGS to liquidate the inventory and or return it to you at full cost of reimbursement.

**17.3 DISCONTINUANCE RIGHTS AND NOTICE**

GGS shall for any reason have the right upon ninety (90) days prior written notice to discontinue purchases of products from you. In the case of private label products (e.g. *Westward, LumaPro, Dayton*), GGS, at its option, may repurchase at cost from you all name plates, Operating Instructions and Parts Manuals (OIPM), cartons, dies, and other private label related materials or may require you destroy above referenced materials, and certify to us that you have destroyed such materials. All notices shall be sent via facsimile and express mail to the names and addresses listed in the Agreement. Such notices shall be effective three (3) business days after faxing or mailing of the notice(s).

**18. FORCE MAJEURE.** Grainger Global Sourcing shall not be liable for any delay in or impairment of performance resulting in whole or in part from Acts of God, acts of war, acts of terrorism (whether actual or threatened) governmental decrees or controls, insurrections, epidemics, quarantines, labor disruptions, shortages, communication or power failures, fire, accident, explosion, inability to procure product or obtain permits and licenses, supplies or raw materials, severe weather conditions, catastrophic events or any other circumstances or cause beyond the control of Grainger Global Sourcing in the conduct of its business.

**19. ENTIRE AGREEMENT AND SURVIVAL**

This Agreement, and Attachments 1-4, which are incorporated by reference, contain the entire understanding between GGS and the Supplier, and supersede and terminate all previous agreements and understandings, verbal or otherwise, at any time existing between GGS, any of its subsidiaries, divisions or affiliates, and the Supplier. No modification of this Agreement shall be binding upon either party unless it is in writing, and is signed by an authorized representative of each party. To the extent the provisions of any of the Attachments are inconsistent with the language of this Agreement, the language of this Agreement shall control first, then the attached Purchase Order terms, and then the Supplier Handbook and Product quotation. The provisions of paragraphs 9-13 and 16-17.3 shall survive the termination, cancellation or expiration of this Agreement.

REFER TO THE SUPPLIER INFORMATION HANDBOOK FOR MORE DETAILED EXPLANATIONS OF THE FOLLOWING LISTED SUBJECTS:

PACKAGING AND LABELING REQUIREMENTS
INSTRUCTIONS ON SOLID WOOD PACKING MATERIAL
LOGISTICS INFORMATION (SHIPPING INSTRUCTIONS, ETC)
UL LISTING
PRODUCT LIABILITY INSURANCE
PAYMENT INSTRUCTIONS
NAFTA INFORMATION
GGS TOTAL QUALITY PLAN
CHANGE REQUEST FORMS

The Supplier Handbook including the above sections are incorporated by reference and made a part here of.

Purchase orders covering initial shipments will follow shortly. We are confident that this new program will result in increased sales and a mutually beneficial relationship for both Steiner Industries and GGS.

Please acknowledge acceptance of this document and return it to my attention by September 10, 2003. We look forward to working with you in the future.

Sincerely,

Joseph Stachowicz
President
Grainger Global Sourcing

The person signing this Agreement is authorized to bind Steiner Industries to the terms and conditions of this Agreement.

**COMPANY NAME:** _Steiner Industries_

**BY:** _Robert Steiner_

**TITLE:** _President_

**DATE:** _9-10-03_

Attachments:

1.  Confidentiality Agreement
2.  Purchase Order Terms and conditions
3.  Product Quotation

CONFIDENTIALITY AGREEMENT

NOW THEREFORE, in consideration of the mutual promises exchanged herein, the parties agree to receive such information from the other party, and to disclose such information to the other party subject to the following terms and conditions:

1.  The term "Information" means technical and business information, whether written, oral, digital or graphic that the parties disclose to each other, including but not limited to financial and marketing plans and records, and further including any proposed trademark, patent, design and other registrations, business strategies and relationships with third parties, prototypes, customer lists, present and proposed products and services, trade secrets, product designs, dies and tooling, and all software and hardware associated therewith.

2.  Each party agrees to protect such Information of the other party from disclosure to anyone other than the directors, officers, employees and agents ("Representatives") of the receiving party who have a business related need to have access to such Information in conjunction with the purpose of this Agreement. Each party will use the same degree of care to protect such Information of the other party as it uses to protect its own Information of like importance.

3.  Except as otherwise agreed, no license to the receiving party, nor any other rights whatsoever in any manner whether in trademark, patent or copyright laws, or any ownership or right of registration of any trademark, copyright or patent or any other right "Intellectual Property" which now or may thereafter be owned or claimed by the disclosing party or any subsidiary, employer, or agent thereof is either granted or implied by this Agreement.

4.  Each party warrants to the other that it has the right to disclose any Information disclosed under this Agreement, and that such disclosure does not violate the rights of any third parties or any other agreement. Neither party shall advertise, promote or disclose the intent, nature, scope or existence of a proposed or existing supplier relationship to any third party, nor shall either party deem this Agreement an endorsement of each other. In accordance therewith, neither party shall use either party's name to solicit business from third parties.

5.  Upon request, all Information exchanged between the parties, and all production overruns, quality rejects, and all copies thereof shall be destroyed or returned, and not retained by the receiving party or its Representatives in any form or for any reason. Upon request, each party shall furnish written confirmation that it has done so, and in the case of overruns or rejects, no sale or disposition thereof may occur without Grainger's prior written consent.

6. This Agreement is the entire agreement regarding obligations to protect Information disclosed to each other, and each party represents that the party signing below is an authorized officer, agent or representative, and that the terms of this Agreement are enforceable against the signatory and each of them. The duties and obligations to protect Information shall continue perpetually after receipt of Information, and shall survive termination of this Agreement and any other agreements that the parties may execute. This agreement may be modified or terminated only by mutual written agreement; and it shall be enforceable in the country where Supplier is located, the United States and where any breach is, or may occur. It shall be governed by the laws of the State of Illinois, U.S.A. All notices pursuant to this Agreement shall be sent to the address on the first page of this Agreement to the name and title listed below.

Grainger International, Inc.
by its authorized officer or agent

By: _____
        Joseph Stachowicz

Title: _____Pfesident_____

Date: ____9/17/03____

Supplier by its authorized officer, agent
or representative

By: _____
        Supplier

Title: _____

Date: ____9-12 03____

Attachment 2

**Grainger Global Sourcing Purchase Order Terms and Conditions**

All transactions and acknowledgements are subject to the terms and conditions on the face of this Grainger Global Sourcing (GGS) Purchase Order. No terms or conditions in any acceptance, confirmation, acknowledgment or invoice from Supplier, contrary to or modifying this order shall apply unless approved and accepted in the United States in writing by, GGS, Grainger International, Inc., W.W. Grainger, Inc., or its subsidiaries or affiliates. Supplier shall not fill this order at a price higher than specifically agreed upon with the signer of this order. Shipment or providing any of the Products or services referred to in the GGS purchase order shall constitute complete and unqualified acceptance of the terms and conditions set forth herein including those on the face of the GGS purchase order, and shall constitute an agreement that this purchase order and contract arising therefrom shall be governed by the provisions of the Uniform Commercial Code and the laws of the State of Illinois, and not the United Nations Convention on the Sale of Goods. In accordance therewith, the parties submit to the jurisdiction of the state and federal courts of Cook County, Illinois.

1. **PRODUCTS**    As used herein, the term "Product" or "Products" or "Services" shall mean goods to be manufactured or services provided by Supplier or its subcontractor and privately branded exclusively for Grainger Global Sourcing ("GGS"), a division of Grainger International, Inc. It also includes any and all improvements, changes and/or modifications, which may be made by Supplier and its subcontractors, or GGS.

2. **PRODUCT WARRANTY**    Supplier warrants and guarantees that for three (3) years from the date of receipt of Products by GGS at a U.S. port of entry, that the Products shall be free from manufacturing defects, will be manufactured in accordance with agreed specifications and samples; and will be merchantable and fit for the purposes for which the Products are intended to be used; and that the patents, trademarks, trade names, designs and trade dress and proprietary rights used in the manufacture of Product or the Products are either owned by/or used under authorized license or other means by Supplier. Products are warranted to be in compliance with all applicable State and U.S. government agency requirements and other standards. Supplier shall provide reasonable cooperation regarding resolution of defective product manufacturing claims and issues, including but not limited to: resale credits or reimbursement for rework costs (including disposal and shipment costs) for defective and damaged product, which in the reasonable discretion of GGS cannot be reworked.

3. **PRODUCT LIABILITY INSURANCE AND PRODUCT LIABILITY INDEMNITY**
   a. Insurance. Supplier will provide Product Liability Insurance to cover all Products sold to Grainger Global Sourcing (GGS). GGS considers evidence of Product Liability Insurance to be a copy of an Accord Certificate of Insurance and a copy of the Broad Form Vendors Endorsement (Form CG 20 15 11 88) issued by your insurance company or broker. GGS requires that Supplier provide proof of insurance before or upon execution of this Agreement and annually thereafter as your Product Liability Insurance renews. Please refer to the Supplier Handbook - Product Liability Insurance, for additional information

   b. Indemnity Seller agrees to protect, defend, indemnify, assume any liability, save and hold harmless Grainger,Global Sourcing (GGS), it's parent company W. W. Grainger, Inc and their agents, subsidiaries and affiliates, employees, insurers, successors and assigns, from and against any claims, demands, suits, liabilities, penalties, losses, damages, or charges, settlements, judgments, costs and expenses (including attorney's fees incurred), which at any time be imposed upon, incurred by or asserted or awarded against GGS ("Liabilities") relating to any product covered by this purchase order including but not limited to Liabilities arising out of or allegedly based on any defect, failure, failure to warn, failure to label or disclose, breach of warranty or representation (express or implied), any product safety or quality control recall, corrective action, product retrofit, and any legal proceeding connected with any such product or arising out of any actual or alleged violation, with respect to such products of any international, Federal, state, or local treaty, law, statute, ordinance, administrative order, rule, or regulation, regulatory proposition, enactment or resolution.

4. **QUALITY CONTROL**    On all Product shipments, Supplier shall inspect for quantity and quality. However, GGS, or its agent, shall have the right to make its own inspection and reject any Products not complying with any Purchase Order or this Agreement. GGS may dispatch, at its own expense, a quality control person to work with Supplier personnel for purposes of inspection of any aspect of production by Supplier of the Products. Such persons shall have unrestricted access to that portion of Supplier's plant facilities where Products are manufactured; should take possession and control of a reasonable number of samples, and in cooperation with Supplier's engineers, shall have the right to review quality control with respect to the material and workmanship of Products being manufactured by Supplier. Each shipment of Products manufactured and sold hereunder to GGS shall be accompanied by accurate

quality control reports (the nature, content and form of such reports to be agreed by Supplier and GGS) prepared by Supplier with respect to the shipment.

5. **RECALLS**  Supplier agrees to immediately notify GGS in writing of any quality control deficiency, proposed product recall or corrective action on a product sold to GGS.  Additionally, GGS may initiate upon consultation with Supplier, a recall or corrective action and Supplier agrees to cooperate in such actions. Whether initiated by GGS or Supplier, Supplier agrees to reimburse GGS for all reasonable costs associated with the identification of the customers, product identifiers and end-users of the product and the processing of any recall through GGS's system (including freight, labor and materials for the repair and replacement or disposition of products).

6. **INFRINGEMENT WARRANTY AND INDEMNITY**

    a.  Supplier has reviewed the Products to be purchased by GGS, and represents and warrants that Products sold to GGS will not infringe or violate, any third party rights, including without limitation, any property, contractual, copyright, trademark, trade dress, patent, proprietary information or non-disclosure rights.

    b.  Supplier shall defend, hold harmless and indemnify W.W. Grainger, Inc., GGS, Grainger International, Inc., and its customers and agents for any claim, allegation, judgement, loss, damage, expense or liability, (including attorneys fees, costs and expenses), that may result by reason of any allegation or lawsuit of patent, trademark, copyright, trade dress or other proprietary right, infringement or claim.  Grainger Global Sourcing shall promptly notify Supplier of any claim, and Supplier shall promptly assume the defense and indemnification of the tendered claim.

7. **PRODUCT INFORMATION**   Supplier shall provide to Grainger Global Sourcing (GGS) complete and accurate information and data for all Supplier products, whether or not purchased by GGS.  Supplier shall provide and maintain competitor cross-reference data for Products, as agreed by Supplier and GGS.

8. **PRODUCT INFORMATION AND DATA APPROVAL**   Supplier will annually review and certify the accuracy of all product information and data provided to GGS.

9. **PRODUCT INFORMATION AND DATA RIGHTS**   Supplier grants to Grainger Global Sourcing (GGS) a non-exclusive, perpetual, irrevocable, worldwide, royalty-free right to use all product information and data provided by Supplier, including but not limited to manuals, applications, safety information and cross reference data, in connection with GGS's business.  This right includes, but is not limited to the right to copy, publish, sell, transfer, distribute, sublicense and prepare derivative works (including translations) of such information by any method, and in any and all forms and media now or hereafter known.  Such right may be exercised by GGS, its parent company W.W. Grainger, Inc and their divisions, subsidiaries and affiliates, and commences on the effective date of the Agreement.

10. **BUSINESS PRACTICES AND WARRANTIES**   Supplier warrants and represents that it will undertake no actions, which may in any way give rise to GGS's liability under United States, federal or state law, legislation or regulation of any kind, Supplier agrees, represents and warrants on a continuing basis that Products and or their components supplied to GGS or its agents and representatives will not be manufactured with prison labor, forced labor, indentured labor under penal sanction.  This applies to products produced by convict labor, forced or indentured labor performed by children or persons of any age.   Additionally, all manufacturing activities shall comply with the laws of Supplier's place of manufacture, export or business, and United States Treasury Department and Customs Services regulations relating to import merchandise.  Supplier further represents and warrants that it is aware of the U.S. Foreign Corrupt Practices Act (FCPA), and that it will not perform any actions giving rise to liability to GGS or W.W. Grainger, Inc., or itself under the FCPA or any law of Supplier's place of manufacture or business.

11. **TAXES, FEES, DUTIES**  Supplier shall be responsible for all taxes, fees and duties of any type levied or imposed by any governmental body or quasi-governmental body in Supplier's country of manufacture.

12. **DISPUTE RESOLUTION**    In the event of a dispute in the interpretation, construction or performance of this Agreement or any breach thereof the parties shall discuss whether or not to submit the dispute to arbitration, including the place of arbitration and the number of arbitrators.  If the parties are unable to agree on a specific action within thirty (30) days either party may commence a suit in the courts of the State of Illinois, U.S.A., and both parties herewith consent to jurisdiction therein, or GGS, at its option, may commence a suit at Supplier's principal place of business, or wherever Supplier is engaged in business.

13. **GOVERNING LAW** This Purchase Order shall be construed and interpreted in accordance with, and the rights and obligations of the parties hereto shall be determined by the laws of the State of Illinois, U.S.A. and not the United Nations Convention for the International Sale of Goods.  This Agreement shall be executed in the English language, which shall be the original and shall control in the event of any difference between the English text of this Agreement and any translation hereof which may be made.

14. **ASSIGNMENT**  Neither this Purchase Order, nor any of its benefits and duties, shall be assigned or subcontracted by either party to any other person, legal or corporate entity, without the prior written consent of the other party;

15. **RELATIONSHIP OF PARTIES**   The parties hereto are independent contractors, and are not partners, joint ventures, employees or agents.  Neither party shall have the authority to act, make representations, or make commitments on behalf of the other party.

16. **NOTICES**   Any notice or other communication required by this Purchase Order will be deemed to have been fully given only if sent and received via e-mail, confirmed facsimile transmission or express courier with evidence of receipt by the dispatching party, such notice to be effective upon receipt of notice.

17. **CONFIDENTIALITY**   Supplier agrees that it shall keep strictly confidential any and all information it receives from GGS during the term of this Agreement and five (5) years following its termination.

18. **SURVIVAL AND REMEDIES**   The warranties and guarantees, indemnities and representations contained herein shall survive the cancellation, expiration or termination of this Purchase Order.

19. **FORCE MAJEURE.**   Grainger Global Sourcing shall not be liable for any delay in or impairment of performance resulting in whole or in part from Acts of God, acts of war, acts of terrorism (whether actual or threatened) governmental decrees or controls, insurrections, epidemics, quarantines, labor disruptions, shortages, communication or power failures, fire, accident, explosion, inability to procure product or obtain permits and licenses, supplies or raw materials, severe weather conditions, catastrophic events or any other circumstances or cause beyond the control of Grainger Global Sourcing in the conduct of its business.

20. **COMPLETE AGREEMENT**  These purchase conditions supplement the GGS Supplier Agreement, the Supplier Product quotation to GGS and along with the Confidentiality Agreement constitute the complete agreement between the parties, and together shall exclusively govern the terms and conditions unless otherwise expressly excluded. Whenever there shall be an absence of terms, or a conflict between the terms contained in the Supplier Agreement or these Purchase Order terms, the Supplier Agreement terms shall take precedence.

**21. SUPPLIER PERFORMANCE METRICS**
In order to provide GGS with the ability to provide operational excellence, Supplier has agreed to an objective to meet or exceed the following minimum Supplier performance metrics and standards identified below.

| METRIC | SUPPLIER ACTION | SUPPLIER MEASUREMENT |
|---|---|---|
| 1) On-Time Shipping | a) "X" Week Lead time Compliance<br>b) Purchase Order Confirmation within 72 hours.<br>c) Shipping Confirmation within 72 hours.<br>d) Shipment Documentation within 72 hours. | 95% on time |
| 2) Lines Shipped Complete | | 95% line fill rates |
| | | 95% quantity fill rates |
| 3) Quality Initiatives/Programs | | o   100% Product Specification compliance.<br>o   Product Returns not to exceed 2% of Supplier purchases. |

Supplier will assign the proper amount of resources (i.e. employees, time, and money) to the appropriate functional area (Operations, Supply Chain, etc.). Additional performance metrics and standards may be agreed to by Supplier and Grainger through subsequent amendments of this SAL. Enforcement of these metrics will be subject to GGS' audit rights and to contract remedies. Definitions of the above referenced metrics are found in Appendix A. GGS agrees that it will take reasonable steps, e.g. current GGS business and operating practices, to assist "Supplier" in achieving these performance metrics and standards.

If, at any time, Supplier fails to meet any one or all of the performance metrics described above and subject to the notice provisions of Section 17 hereof in the event of termination, GGS shall be entitled to implement one or more of the following options:

a)   Conduct a line review;
b)   Provide Supplier with an acceptable amount of time to correct the failure of not less than 30 nor more than 60 days; and/or
c)   Notify Supplier of discontinuance of the line of products under this Agreement, in whole or in part, with a financial penalty to be assessed by Grainger for failure to meet the performance metric(s) as provided above; and/or
d)   Continue the relationship "as-is" with a financial penalty to be assessed by Grainger for failure to meet the performance metric(s) as provided above. Supplier penalties will be assigned through subsequent amendments of this SAL. Agreed to penalties shall be deducted from payables due Supplier via a debit memo.

**Appendix A**

Supplier Performance Metrics

**DEFINITIONS OF METRICS**

**Purchase Order Confirmation**
Measures whether purchase order (PO) was acknowledged by return fax or email to Grainger Global Sourcing (GGS) within 72 hours or receipt.

**Leadtime Compliance**
Measures the percentage of PO units ordered that the Supplier can provide within the agreed upon leadtime.

**Shipping Confirmation**
Supplier will complete the Shipping Confirmation to confirm shipment ready date. Measures whether communication requesting scheduled ship date and quantity confirmation was acknowledged within 72 hours of receipt.

**Shipping Documents**
One full set of original shipping documents has been furnished to GGS's freight forwarder. One full set of copy documents has been sent to GGS. Measures whether the required shipping documents are complete, accurate and in GGS's possession within 72 hours of shipment. Required documents:
1. Commercial invoice and HTS (Tariff) numbers
2. Import Packing List (indicating PO number)
3. Export VISA / or License where applicable
4. Ocean Bill of Lading or Air Waybill
5. Forwarders Cargo Receipt
6. Certificate of Origin (Statement confirming product is marked Country of Origin)
7. Other documents as applicable (e.g. Fumigation Certificate)

**Order Fill Rate**
Measures the percentage of all units on a PO that the supplier is able to ship compared to scheduled ship confirmation quantity. Example, Supplier is able to ship 950 units of a 1,000-unit PO. Order Fill Rate is 95%.

**Specification Compliance**
Measures compliance to product, packaging and labeling specifications associated with PO. Includes
- Product performance attributes
- Country of origin markings
- Compliance to standards, certifications, listings
- Operating Instructions
- Parts Manual
- All cartons marked with applicable data

Measurement is communicated via Disposition Authorization (DA) or Corrective Authorization Report (CAR).

**Product Returns**
Measures cost of product returned due to damage, defect or warranty returns.

Grainger Global Sourcing will provide measurement results every quarter.

Date

Mr. Robert Steiner
Steiner Industries
5801 N. Tripp Ave.
Chicago, IL,  60046


Re:      - License agreement and authorization

Dear Bob,

This letter is in addition to the Supplier Acceptance Letter ("SAL") between Grainger Global Sourcing (GGS) a division of Grainger International, Inc., a wholly owned subsidiary of W.W. Grainger, Inc., and Steiner Industries.  All of the terms of the SAL are still effective.

You have been or will be asked to manufacture private label products for Grainger Global Sourcing (GGS), a division of Grainger International, Inc., that meet GGS's specifications and which bear one or more of W.W. Grainger, Inc.'s trademarks, which GGS is licensed to use.  In connection with these products, the following will apply:

1. Products Made to GGS's Specifications - You will make product according to the quality specifications given to you by GGS.  You will be selling these products only to GGS.

2. Use of W.W. Grainger Trademarks - Each of the products, and packaging in which the product is placed, shall bear the trademark {enter brand name(s)} ("Mark").  The Mark will be used only in a manner approved by GGS and such use shall include the appropriate trademark notice, as provided by GGS.  You will not use this Mark or any other GGS mark except in a manner approved by GGS.  GGS will continue to own all rights in its Mark.  You will stop using any and all representations of all GGS Marks if the SAL is terminated for any reason.  You may not sell any product after that date that bears any of GGS's Marks or which is in packaging bearing the GGS's Marks.  (See paragraph 15.1 of the SAL for other applicable terms.)

This letter authorizes Steiner Industries to produce product bearing the Mark in their Taiwan plants.

Sincerely,

Joseph Stachowicz
President
Grainger Global Sourcing

AGREED TO AND ACCEPTED BY:

By: _____

Title: _____

Date: _____

5/01/2002

13

04/09/2008  10:00    7735883450               STEINER INDUSTRIES                PAGE  07/07

**FORWARDER'S CARGO RECEIPT**

FCR NO.    GGS300001VN007

**century**

## Century Distribution Systems, Inc.

| SHIPPER | |
|---|---|
| APEX VIETNAM CO.LTD<br>NO. 3 STREET, DONG AN INDUSTRIAL PARK,<br>THUAN AN DISTRICT, BINH DUONG PROVINCE | |

RECEIVED BY CENTURY DISTRIBUTION SYSTEMS, INC.
(hereinafter "Company") in apparent good order and condition unless otherwise indicated, the package(s) listed below, said to contain the goods hereinafter described, and marked and numbered as shown herein for shipment in accordance with explicit instructions of the owner of the goods as noted in the documents of transfer. These packages may be included in a container to be shipped under a Bill of Lading issued and signed by the carrier which is to transport the packages to their destination; all terms, conditions and clauses printed or otherwise inserted on the carrier's Bill of Lading to apply.

| CONSIGNEE |
|---|
| GRAINGER GLOBAL SOURCING<br>11200 E 210 HWY KANSAS CITY, MO 64161<br>TEL: (847) 535-1402<br>ATTN: JESSICA QUINN |

| NOTIFY E.BESLER & CO. |
|---|
| 115 MARTIN LANE ELK GROVE VILLAGE, IL 60007<br>TEL: (847) 781 - 6464<br>ATTN: MIKE KOSECK / GRACE KUCZYNSKA |

| OCEAN VESSEL | PORT OF LOADING |
|---|---|
| UNI-PACIFIC V.077B | HOCHIMINH CITY |

| PORT OF DISCHARGE | PLACE OF DESTINATION | CONSIGNEE'S ORDER NO. | NO. OF ORIGINAL ISSUED |
|---|---|---|---|
| LOS ANGELES, USA | KANSAS CITY, MO, USA | | THREE (03) |

See terms on reverse

**PARTICULARS FURNISHED BY SHIPPER**

| MARKS AND NOS. | QUANTITY AND KINDS OF PACKAGE | DESCRIPTION OF GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| CY/CY<br>TGHU9143139/AAT8260<br>TRLU4950708/AAT8259<br>OOLU7702710/AAT8395 | | 01X40'DC & 02X40'HC CONTAINERS:<br>627 CTNS     3327 PCS<br>624 CTNS     2496 PCS<br>505 CTNS     3030 PCS<br>1756 CTNS    8853 PCS | KGS<br>7,145.00<br>6,112.00<br>6,060.00<br>21,317.000 | M3<br>63.040<br>64.700<br>52.360<br>180.100 |

SHIPPING MARKS
-FRONT & BACK-

△ GGS

KANSAS CITY,MO
RN#
GGS P.O #:
STOCK NO .:
MFR.ITEM NO.:
SIZE :
Q'TY :
G.W :  LBS
N.W:  LBS
C/NO .:
TOTAL NUMBER OF PACKAGES IN WORDS VIET NAM

VEST, CHORE COAT, BIB OVERALLS, COVERALLS
PURCHASE ORDER NUMBER 016648
PLEASE SEE RIDER
L/C NO.: CICI - 323858

ON BOARD DATE: 10.JUL.2007
FREIGHT COLLECT
"SHIPPER'S LOAD AND COUNT"
THIS SHIPMENT DOES NOT CONTAIN ANY WOOD PACKING MATERIAL.

ALSO NOTIFY PARTY:  GRAINGER GLOBAL SOURCING
100 GRAINGER PKWY
LAKE FOREST, IL 60045
TEL: (847) 233-8636
ATTN: JESSICA QUINN

| FREIGHT & CHARGES | PREPAID | COLLECT |
|---|---|---|

IN WITNESS WHEREOF, the undersigned, signing on behalf of CENTURY DISTRIBUTION SYSTEMS, INC. has on the date indicated below affirmed to this cargo receipt.

Century Distribution Systems, Inc.

**EXHIBIT**
**C**

| DESTINATION AGENT | | | |
|---|---|---|---|
| PLACE OF RECEIPT<br>HO CHI MINH CITY | DATE OF RECEIPT<br>08.JUL.2007 | PLACE OF ISSUE<br>HOCHIMINH CITY | DATE OF ISSUE<br>17.JUL.2007 |

FILED: AUGUST 6, 2008
08CV4451
JUDGE COAR
MAGISTRATE JUDGE DENLOW
JFB